# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-CA-01098-COA

**DONALD RAY WARNER**                                                          **APPELLANT**

**v.**

**MELANIE KAY WARNER**                                                          **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 09/25/2020 |
| TRIAL JUDGE: | HON. VICKI B. DANIELS |
| COURT FROM WHICH APPEALED: | DESOTO COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | CHARLES E. WINFIELD |
| | ASHLYN BROWN MATTHEWS |
| ATTORNEYS FOR APPELLEE: | A. E. (RUSTY) HARLOW JR. |
| | KATHI CRESTMAN WILSON |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | REVERSED AND RENDERED IN PART; |
| | REVERSED AND REMANDED IN PART - |
| | 06/07/2022 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WILSON, P.J., GREENLEE AND EMFINGER, JJ.**

**GREENLEE, J., FOR THE COURT:**

¶1.     In 2020, Donald Warner ("Don") and Melanie Warner consented to a divorce based on irreconcilable differences.[1]  Don appeals the judgment of the DeSoto County Chancery Court claiming that the chancellor erred in (1) classifying, valuing, and distributing the marital property, (2) awarding alimony to Melanie, (3) finding him to be in contempt, and (4) awarding attorney's fees to Melanie.  After review, we reverse in part the chancellor's

---

[1] The chancery court granted the parties a divorce, and they do not challenge that portion of the ruling on appeal, nor do we disturb it.

judgment regarding the division of property and alimony and remand for further proceedings consistent with this opinion. We reverse and render the chancellor's finding of contempt and the corresponding award of attorney's fees for contempt to Melanie. Finally, the chancellor should reconsider the award of attorney's fees for the divorce action in light of the reversal of the property division and alimony awards.

## FACTS AND PROCEDURAL HISTORY

¶2.     Don and Melanie were married in 1984 and had five children during their marriage.[2] In October 2018, Melanie filed a complaint for separate maintenance and other relief against Don. In response, Don filed a counter-complaint requesting a divorce on the grounds of habitual cruel and inhuman treatment, constructive desertion, or, in the alternative, irreconcilable differences.

¶3.     Several months later, Melanie filed a motion for a restraining order against Don, which was denied. Then Melanie filed a motion for temporary relief and an amended complaint. In the amended complaint, she requested a divorce on the grounds of habitual cruel and inhuman treatment, uncondoned adultery, habitual drunkenness, or, in the alternative, irreconcilable differences.

¶4.     In September 2019, the chancellor entered a temporary order granting Melanie exclusive use and possession of the marital residence and prohibiting Don from visiting the residence without prior approval. The chancellor also ordered Don to pay "for any and all of the repairs on the marital home," and for "marital debts and expenses including but not

---

[2] At the time of Don and Melanie's divorce, all of the children were over twenty-one years old, and their support was not an issue.

limited to medical insurance." Finally, the chancellor ordered Don to pay temporary alimony to Melanie in the amount of $850 per month.

¶5.    Approximately two months later, Don filed an emergency motion to clarify, amend, or modify the temporary order. Don argued, among other things, that the chancellor's provision requiring him to pay the "marital debts and expenses including but not limited to medical insurance" was confusing. Don also alleged that Melanie had been withholding his mail—which contained bills—and requested an itemized statement of any outstanding payments.

¶6.    In January 2020, the chancellor filed an order nunc pro tunc clarifying its September 2019 temporary order. The chancellor stated that Don "shall continue to pay all the bills needed to operate the household, including but not limited to AT&T, utilities, and medical bills." The chancellor further stated that Don could request an Explanation of Benefits from the insurance company and suggested that Melanie should forward all pertinent mail and bills directly to Don.

¶7.    In August 2020, Melanie filed a petition for citation of contempt. According to Melanie, Don failed to comply with the chancellor's temporary order by failing to pay certain expenses. Don filed a response and asserted, among other things, that he had not willfully violated the chancellor's order. Then he filed another motion for clarification of the temporary order.

¶8.    On September 22, 2020, Don and Melanie filed a consent to divorce on the grounds of irreconcilable differences. A trial was held for the chancellor to determine, among other

3

things, issues regarding (1) the classification, valuation, and distribution of property, (2) alimony, (3) contempt, and (4) attorney's fees.

¶9.     At trial, Don testified that he and Melanie worked for MCI in Texas when they married in 1984.  Thereafter, they moved to Virginia where Don continued to work for MCI, and Melanie worked until around the time she became pregnant.  Then Don and Melanie moved to Tennessee, and Don worked for Weatherproofing Systems—a company that he co-owned with his father.[3]  In 1991, Don and Melanie moved back to Texas where Don worked for MCI again and Melanie worked for Lima Electronics.  Around 2002, they moved back to Tennessee with their five children.  Don returned to work for WSI, which was co-owned by his parents at the time, and Melanie worked for Hunter Fan for a brief period.  However, Melanie primarily stayed home to care for the children for a total of approximately fifteen years.[4]

¶10.    At the time of trial, Don still worked for WSI and did not have any plans to retire.[5] His gross income was $8,737.60 per month, and his net income was $4,384.23 per month.[6] Don initially testified that WSI did not pay for any of his personal expenses.  However, he later acknowledged that the company provided him with the use of a 2020 F-150 Platinum

---

[3] The record refers to the company as "Weatherproofing Systems" and "Waterproofing Systems Inc."  Hereafter, we will refer to the company as "WSI."

[4] At the time of trial, Don was sixty years old, and Melanie was fifty-eight years old.

[5] Don also owned Oxford Equipment Transport; however, business operations had been inactive for a few years.

[6] Between 2016 and 2019, Don earned approximately $93,000 to $156,000 per year.

pickup truck, money for gasoline, auto repairs, and meals, and a cell phone. According to Melanie, Don also used company funds to purchase alcohol. Additionally, Melanie testified that Don replaced older electronics in their house with new electronics purchased with company funds and then gave the older electronics to WSI. Don testified that he had health insurance and approximately $28,000 in a profit-sharing program. Don expected his social security benefit at retirement to be $2,894 per month.

¶11. Melanie testified that she had an associate's degree in general education. However, she had been working as a bookkeeper since 2018. She worked twenty-five to thirty hours per week for $16 per hour.[7] Melanie's employer did not provide health insurance or retirement benefits. Melanie expected her monthly social security benefit at retirement to be $1,093.[8]

¶12. At the time of trial, Melanie was living in the marital residence, which had been appraised for approximately $580,000. Don and Melanie owed approximately $330,000 on their mortgage, and their mortgage payment was approximately $2,000 per month. Don was living in a camper that was owned by WSI. Although WSI paid the bills associated with the camper, Don testified that he paid $150 to rent the land where the camper was situated. Don testified that he wanted to build a house, but he was left with a deficit after paying his monthly expenses.

---

[7] Between 2014 and 2017, Melanie earned approximately $5,000 to $22,400 per year.

[8] A former wife at the retirement age may qualify for entitlement up to half of her former husband's full social security benefit at his full retirement age. Such, if greater, will supplant the former spouse's full retirement benefit. 20 C.F.R. §§ 404.331, 404.333 (2020).

¶13.    Don testified that he was in good health; however, Melanie had some health problems. Melanie testified that she had been diagnosed with cancer in 2010. Although she had been in remission for approximately ten years, her doctors expected the cancer to return. Melanie also testified that she suffered from anxiety and depression and had been admitted to Parkwood Behavioral Health in 2016 and Crestwood Behavioral Health in 2018. According to Melanie, she was undergoing intensive outpatient counseling three to five times per week. When asked what had triggered her mental-health issues, Melanie explained that it was the "constant degrading behavior" from Don and his "coming home drunk."[9] Melanie was seemingly covered by Don's health insurance, but she would not be covered after the divorce.

¶14.    Don and Melanie testified as to property classification, valuation, and distribution. Afterward, Don seemingly acknowledged that he should pay alimony but did not know how much, and Melanie suggested that she would need $4,200 per month to cover her expenses.

¶15.    As to the contempt petition, Melanie asserted that Don had not paid for the following expenses: gasoline, eyeglasses, a cancer insurance policy, veterinary expenses, automobile expenses, and home maintenance/repairs and lawn maintenance.

¶16.    Finally, Melanie's testified that she was not able to afford attorney's fees and that she did not have any separate money to pay for them. Don seemingly testified that he assumed Melanie was borrowing money from someone or charging her litigation expenses to a credit card.

¶17.    The chancellor issued a bench ruling and then entered a final decree of divorce on

---

[9] Don had been arrested four times and convicted twice of driving under the influence.

September 25, 2020. After the classification, valuation, and distribution of the property, the chancellor noted that the total value of property that Melanie received was $21,884.87, and the total value of property that Don received was $59,060.65. The chancellor noted that Melanie would receive $37,157.78 less in property value. The chancellor rounded that deficit down to $37,000.

¶18. Then the chancellor ordered the parties to put the marital residence on the market immediately and granted Melanie use of the residence until it sold. The chancellor ordered Don to pay for "taxes, insurance, utilities, pest control, appliance repairs, mortgage payments, and the HELOC loan on the property until the property . . . sold." The chancellor stated that after the mortgage, HELOC loan, closing costs, and realtor fees were paid off, Melanie would receive the first $37,000 of the sale proceeds, and Don would be reimbursed for repairs. Then the remaining proceeds would be divided with Melanie receiving 75 percent and Don receiving 25 percent. In her bench ruling, the chancellor explained that she divided the proceeds of the house in such a way as to lessen Don's support obligation. Then the chancellor ordered Don to pay $1,000 per month in permanent alimony until Melanie vacated the residence or the residence sold. After that, Don was ordered to pay $3,500 per month in permanent alimony.

¶19. The chancellor held Don in contempt for his "failure to pay certain amounts as ordered in the Temporary Order . . . ." These expenses included: eyeglasses, cancer insurance, auto repairs, and home maintenance/repairs and lawn maintenance.[10] Accordingly,

---

[10] The chancellor also ordered Don to pay for limestone that predated the temporary order, but he was not held in contempt for any failure to pay.

7

the chancellor awarded Melanie a judgment in the amount of $11,103.15. Finally, the chancellor awarded Melanie $1,500 in attorney's fees for the contempt action and $19,071.75 for the divorce action.

¶20. On appeal, Don claims that (1) the chancellor erred in classifying, valuing, and distributing the marital property, (2) the chancellor erred in awarding alimony to Melanie, (3) the chancellor erred by finding him to be in contempt, and (4) the chancellor erred in awarding attorney's fees to Melanie.

## DISCUSSION

### I. Property Division

¶21. This Court applies a limited standard of review to a chancellor's division and distribution of marital property. *Coleman v. Coleman*, 324 So. 3d 1204, 1209 (¶10) (Miss. Ct. App. 2021). "A [chancellor's] findings of fact will not be disturbed 'unless [the chancellor's] actions were manifestly wrong, [the chancellor] abused [her] discretion, or [the chancellor] applied an erroneous legal standard.'" *Id.* (quoting *Ory v. Ory*, 936 So. 2d 405, 409 (¶7) (Miss. Ct. App. 2006)). "The chancellor's division and distribution will be upheld if it is supported by substantial credible evidence." *Id.* (quoting *Poisso v. Poisso*, 300 So. 3d 1067, 1074 (¶22) (Miss. Ct. App. 2020)).

¶22. To equitably divide property, chancellors must: (1) classify the parties' assets and liabilities as marital or separate, (2) determine the value of the property, and (3) divide the marital property equitably. *Branch v. Branch*, 174 So. 3d 932, 942-43 (¶¶39-41) (Miss. Ct. App. 2015). Don specifically claims that the chancellor erred by misclassifying certain assets

as Melanie's separate property, assigning values to certain marital assets without support in the record for the values assigned, and failing to consider Melanie's separate property or Don's liabilities in dividing the property.

### A. Classification

¶23. Don asserts that the chancellor erred by classifying the following assets as Melanie's separate property: a diamond ring, a piano, a golf cart, and jet skis. "Assets acquired or accumulated during the course of a marriage are subject to equitable division unless it can be shown by proof that such assets are attributable to one of the parties' separate estates prior to the marriage or outside of the marriage." *Williams v. Williams*, 303 So. 3d 824, 833 (¶33) (Miss. Ct. App. 2020) (quoting *Hemsley v. Hemsley*, 639 So. 2d 909, 914 (Miss. 1994)). "There is a rebuttable presumption that all property is marital." *Rhodes v. Rhodes*, 52 So. 3d 430, 437 (¶23) (Miss. Ct. App. 2011) (citing *Yancey v. Yancey*, 752 So. 2d 1006, 1011 (¶20) (Miss. 1999)). "The burden of proof is on the spouse claiming property as a separate asset to rebut this presumption." *Id*. (citing *Horn v. Horn*, 909 So. 2d 1151, 1165 (¶50) (Miss. Ct. App. 2005)).

¶24. At trial, Melanie testified that Don gave her the diamond after their second child was born. Additionally, Melanie testified that the piano was from her mother's estate. We have held that "gifts and inheritances received during marriage constitute the separate property of a spouse." *Neely v. Neely*, 305 So. 3d 164, 168 (¶13) (Miss. Ct. App. 2020) (quoting *Allgood v. Allgood*, 62 So. 3d 443, 447 (¶12) (Miss. Ct. App. 2011)). Then Melanie testified that the golf cart was a gift from Don and her children to celebrate her five-year cancer survivorship.

9

She testified that she used the golf cart to take the trash to the curb and to visit her grandchildren who loved riding on the golf cart with her. Melanie testified that the jet skis were an anniversary gift, and she chose them so that her family could use them. She explained that her grandchildren would ride on them with either her or Don or their children. It is true that one spouse's property may lose its separate character "by virtue of commingling or familial use." *Rhodes*, 52 So. 3d at 437 (¶21) (citing *McKissack v. McKissack*, 45 So. 3d 716, 720 (¶18) (Miss. Ct. App. 2010)). However, considering the evidence that Melanie presented at trial, we cannot say that the chancellor erred by classifying these assets as Melanie's separate property.

### B. Valuation

¶25. Next, Don takes issue with the chancellor's valuation of the marital assets. First, Don claims that the chancellor did not assign values to assets that Melanie received. Specifically, Don asserts that Melanie received lamps from the parties' den and pictures from their craft room that were not attributed values in the Summary of Assets and Debts or assigned any value by the chancellor. However, this Court has declined to hold a chancellor in error for failing to value all marital assets when the chancellor was not provided the necessary documents for proper valuation. *Benton v. Benton*, 239 So. 3d 545, 548-49 (¶12) (Miss. Ct. App. 2018). Here, neither party presented any evidence of valuation for these assets. Furthermore, the chancellor told Don and Melanie that they could make copies of the pictures if they were family photos. For these reasons, we decline to hold the chancellor in error.

¶26. Don also claims that the chancellor improperly valued the following marital assets:

10

a curio cabinet and its contents, a grandfather clock, workbenches/tools, and a 2008 Chevrolet Tahoe. We have held that "it is incumbent upon the parties, not the [chancellor], to prepare the evidence needed to clearly make a valuation judgment." *Norwood v. Norwood*, 305 So. 3d 175, 178 (¶13) (Miss. Ct. App. 2020) (quoting *Martin v. Martin*, 282 So. 3d 703, 707 (¶10) (Miss. Ct. App. 2019)). "[W]hen a chancellor makes a valuation judgment based on proof that is less than ideal, it will be upheld as long as there is some evidence to support [her] conclusion." *Messer v. Messer*, 850 So. 2d 161, 170 (¶43) (Miss. Ct. App. 2003) (citing *Dunaway v. Dunaway*, 749 So. 2d 1112, 1121 (¶29) (Miss. Ct. App. 1999)). "[A chancellor's] findings on valuation 'may be accomplished by adopting the values cited in the parties' 8.05 financial disclosures, in the testimony, or in other evidence.'" *Marter v. Marter*, 95 So. 3d 733, 739 (¶20) (Miss. Ct. App. 2012) (quoting *Jenkins v. Jenkins*, 67 So. 3d 5, 13 (¶19) (Miss. Ct. App. 2011)) (referring to Uniform Rule of Chancery Court 8.05).

¶27.    At trial, Melanie testified that the value of the curio cabinet was "way overstated." The chancellor reduced the value of the curio cabinet from $1,000 as indicated on the marital balance sheet[11] to $800 and awarded it to Melanie. Melanie also testified that the grandfather clock was thirty-six years old and was not worth $800. The chancellor reduced the value of the clock to $400 based on a sale price that the chancellor had seen at an estate sale and awarded it to Melanie. Melanie also testified that the value of the workbenches/tools should be increased. The chancellor increased the value of the workbenches/tools from $5,000 to

---

[11] This document was seemingly stipulated to by both parties, submitted, and received into evidence.

$5,500 and awarded them to Don. Finally, Melanie testified that the value of the 2008 Tahoe was less than $5,000. She estimated its value to be around $3,000 because of its mileage and age, and she testified that she looked it up online. The chancellor decreased the value of the vehicle to $3,000 noting that it had "excessive miles" and that Melanie had looked it up on Kelly Blue Book, though Melanie never specified the online source that she used. The chancellor awarded the vehicle to Melanie.

¶28. As stated, "a chancellor may value assets based on evidence that is based on something less than ideal," but "the chancellor's valuation must be based on at least *some* evidentiary support in the record." *Pruitt v. Pruitt* 144 So. 3d 1249, 1252 (¶11) (Miss. Ct. App. 2014) (emphasis added). After review, we find that there is no evidence supporting the chancellor's assigned value of the curio cabinet or the work benches/tools. Although Melanie testified that the valuation of the curio cabinet should be decreased and the valuation of the workbenches/tools should be increased, she did not provide any alternative valuations for the assets. The chancellor then assigned an arbitrary value to the curio cabinet and the workbenches/tools. Additionally, the chancellor assigned a value to the grandfather clock based on a price that the chancellor had seen at an estate sale. We have held that "[t]he chancellor is not . . . permitted to go outside the record to look for better evidence." *Stroh v. Stroh*, 221 So. 3d 399, 411 (¶38) (Miss. Ct. App. 2017); *see also Pruitt*, 144 So. 3d at 1253 (¶11) (distinguishing "between less-than-ideal evidence presented by parties to the litigation, and information outside of the record that neither party presented").

¶29. Finally, we find that the chancellor erred by valuing the 2008 Tahoe at $3,000. A

vehicle valuation sheet[12] indicated that the vehicle's value was between $4,750 and $6,575.[13] According to Don, the vehicle had a value of $6,575. Although Melanie testified that the Tahoe was probably worth $3,000, she had stated only several days earlier in a financial disclosure that the vehicle had a value of $4,500. And in another financial disclosure, she had stated the vehicle had a value of $5,000. Likewise, according to the marital balance sheet, the vehicle had a value of $5,000.

¶30.    Also, for these reasons, we find that the chancellor erred in her valuation of these marital assets, which resulted in Melanie's calculated share of marital property being reduced by $2,600 and Don's calculated share being inflated by $500.

### C.    Distribution

¶31.    Next, Don takes issue with the chancellor's distribution of the marital property. When dividing the parties' marital property equitably, the chancellor should consider the *Ferguson* factors. *Ferguson v. Ferguson*, 639 So. 2d 921, 928 (Miss. 1994). These factors include:

> 1. Substantial contribution to the accumulation of the property. Factors to be considered in determining contribution are as follows:
>
>> a. Direct or indirect economic contribution to the acquisition of the property;
>>
>> b. Contribution to the stability and harmony of the marital and family relationships as measured by quality, quantity of time spent on family duties and duration of the marriage; and
>>
>> c. Contribution to the education, training or other

---

[12] The valuation sheet was submitted with Don's financial disclosure and received into evidence.

[13] The valuation was based on the vehicle having been driven 250,000 miles.

13

accomplishment bearing on the earning power of the spouse accumulating the assets.

2. The degree to which each spouse has expended, withdrawn or otherwise disposed of marital assets and any prior distribution of such assets by agreement, decree or otherwise.

3. The market value and the emotional value of the assets subject to distribution.

4. The value of assets not ordinarily, absent equitable factors to the contrary, subject to such distribution, such as property brought to the marriage by the parties and property acquired by inheritance or inter vivos gift by or to an individual spouse;

5. Tax and other economic consequences, and contractual or legal consequences to third parties, of the proposed distribution;

6. The extent to which property division may, with equity to both parties, be utilized to eliminate periodic payments and other potential sources of future friction between the parties;

7. The needs of the parties for financial security with due regard to the combination of assets, income and earning capacity; and,

8. Any other factor which in equity should be considered.

*Id*. "A chancellor is required to make findings of fact regarding all applicable *Ferguson* factors." *Ellison v. Williams*, 282 So. 3d 447, 450 (¶8) (Miss. Ct. App. 2019) (quoting *Lowrey v. Lowrey*, 25 So. 3d 274, 285 (¶26) (Miss. 2009)). However, "equitable distribution does not mean equal distribution." *Lacoste v. Lacoste*, 313 So. 3d 1097, 1102 (¶17) (Miss. Ct. App. 2021) (quoting *Lauro v. Lauro*, 924 So. 2d 584, 590 (¶23) (Miss. Ct. App. 2006)).

¶32. After dividing the property, the chancellor determined that the total value of marital property that Melanie received was $21,884.87, and she determined that Don received $59,060.65. Don seemingly asserts that had the chancellor classified the jet skis, golf cart,

14

and piano as marital property, Melanie would have an additional $16,000 in marital property. However, for the reasons discussed, the chancellor properly classified these assets as Melanie's separate property. We reiterate though that the chancellor's erroneous valuations of certain marital assets—the curio cabinet, grandfather clock, workbenches/tools, and 2008 Tahoe—resulted in Melanie's calculated share of marital property being reduced by $2,600 and Don's calculated share being increased by $500.

¶33. Next, Don asserts that, when dividing the property, the chancellor did not consider certain debts that were ultimately assigned to him. Specifically, Don asserts that the chancellor did not consider the fact that he was ultimately ordered to pay medical bills that had been incurred by Melanie in the amount of $10,208.17.

¶34. Don cites *Johnson v. Johnson*, 650 So. 2d 1281 (Miss. 1994), in support of his argument that his debts should have been considered in the property division. In *Johnson*, the husband had a $142,000 judgment against him, based on medical bills incurred by his son. *Id*. at 1286. In reversing the chancellor's judgment, the Mississippi Supreme Court held that this debt should have been considered in any equitable distribution of property as it affected the husband's net income—a *Ferguson* factor. *Id*. Additionally, our supreme court noted that if the question of alimony was reached on remand, the debt would again be a factor for consideration. *Id*.

¶35. In her bench ruling, the chancellor mentioned the *Ferguson* factors and then divided the marital property. Afterward, she noted the total value of the assets that each party received—$21,884.87 for Melanie and $59,060.65 for Don. Then the chancellor held that

15

$37,000 of the proceeds from the sale of the house would be given to Melanie to lessen Don's support obligation. Finally, the chancellor addressed the parties' debts by simply deciding who would pay what.[14] The chancellor did not appear to make any findings of fact as to Don's assigned debts during the division of the marital property. Similarly, in her written order, the chancellor addressed the parties' debts by simply deciding who would pay what. However, "[m]arital debt lies within the factors set forth in *Ferguson*, as it may be defined as an 'economic consequence' or as 'any other factor which in equity should be considered.'" *Griner v. Griner*, 235 So. 3d 177 (¶11) (Miss. Ct. App. 2017) (quoting *Cuccia v. Cuccia*, 90 So. 3d 1228, 1233 (¶12) (Miss. 2012)). Accordingly, we find that the chancellor erred in the division of property and reverse the chancellor's judgment. On remand, the chancellor should make findings of fact as to all applicable *Ferguson* factors, including debt.[15]

¶36. Finally, Don asserts that the chancellor should have considered the value of Melanie's diamond ring when dividing the marital property. In her bench ruling, the chancellor stated, "of course, [Melanie's] diamond wedding ring, she says it's worth $14,000, but it was a non-marital asset, so I guess it doesn't really matter." Although separate property is not subject

---

[14] The chancellor stated that Don was ordered to pay the debts because he had previously been ordered to pay them in the temporary order.

[15] Don also asserts that the chancellor failed to consider that the 1985 Chevrolet truck that was awarded to him had $10,000 in damages after Melanie took a baseball bat to it. Melanie admitted to damaging the truck but testified that it still had a value of $500. Additionally, the marital balance sheet indicated that the vehicle was worth $500. Although Don submitted an estimate for repairs into evidence, Don was not obligated to repair the vehicle. Accordingly, we cannot say that this was a debt or obligation assigned to Don that the chancellor failed to consider.

to equitable division, marital property should be "equitably divided, employing the *Ferguson* factors as guidelines, in light of each parties' non-marital property." *Lowrey*, 25 So. 3d at 293 (¶44); *see also Brown v. Brown*, 797 So. 2d 253, 256 (¶6) (Miss. Ct. App. 2001) ("Separate property is not subject to equitable distribution."). Therefore, on remand, the chancellor should divide the marital property in light of the parties' non-marital property. Additionally, separate property may be considered when deciding the issue of alimony. *See Lowrey*, 25 So. 3d at 293 (¶44). Therefore, we will discuss this argument further in Issue II.

## II.    Alimony

¶37.    Next, Don claims that the chancellor's award of alimony to Melanie should be reversed. "Alimony awards are within the discretion of the [chancellor], and [her] decision will not be reversed on appeal unless the [chancellor] was manifestly in error in [her] finding of fact and abused [her] discretion." *Norwood*, 305 So. 3d at 179 (¶20) (quoting *Armstrong v. Armstrong*, 618 So. 2d 1278, 1280 (Miss. 1993)). The chancellor "must consider the *Armstrong* factors in determining whether to award alimony and the amount and type of the award." *Leblanc v. Leblanc*, 271 So. 3d 494, 505 (¶51) (Miss. Ct. App. 2018)). The *Armstrong* factors are:

1. The income and expenses of the parties;

2. The health and earning capacities of the parties;

3. The needs of each party;

4. The obligations and assets of each party;

5. The length of the marriage;

17

6. The presence or absence of minor children in the home, which may require that one or both of the parties either pay, or personally provide, child care;

7. The age of the parties;

8. The standard of living of the parties, both during the marriage and at the time of the support determination;

9. The tax consequences of the spousal support order;

10. Fault or misconduct;

11. Wasteful dissipation of assets by either party; or

12. Any other factor deemed by the court to be "just and equitable" in connection with the setting of spousal support.

*Armstrong*, 618 So. 2d at 1280.

¶38. In the final judgment, the chancellor awarded Melanie $1,000 per month in permanent alimony that would increase to $3,500 per month when she vacated the marital residence or the residence sold. On appeal, Don claims that the award of alimony to Melanie should be reversed because (1) the chancellor erred in the property division, (2) Melanie was not left with a deficit after the property was divided, (3) the chancellor did not consider his debts and expenses and left him with the inability to maintain a decent standard of living, and (4) the chancellor improperly imputed additional income to him.

¶39. First, Don claims that because the chancellor erred in the property division, the alimony award must be reversed. This Court has noted that "[a]limony and equitable distribution are distinct concepts, but together they command the entire field of financial settlement of divorce." *Daniels v. Daniels*, 950 So. 2d 1044, 1047 (¶10) (Miss. Ct. App. 2007). "Therefore, where one expands, the other must recede." *Id*. As discussed, we reverse

18

the chancellor's judgment and remand for the chancellor to equitably divide the marital property, employing the *Ferguson* factors as guidelines, in light of each parties' non-marital property. If, on remand, the court's analysis of the relevant *Ferguson* factors yields a different equitable division of the marital property, the court's rendering of alimony would also have to be reconsidered. However, we find it necessary to reverse and remand the issue of alimony on its own as well.

¶40. Don claims that Melanie was not left with a deficit and therefore should not have been awarded alimony. Our supreme court has held:

> If there are sufficient marital assets which, when equitably divided and considered with each spouse's non-marital assets, will adequately provide for both parties, no more need be done. If the situation is such that an equitable division of marital property, considered with each party's non-marital assets, leaves a deficit for one party, then alimony based on the value of non-marital assets should be considered.

*Lowrey*, 25 So. 3d at 293 (¶44) (quoting *Lauro v. Lauro*, 847 So. 2d 843, 848 (¶13) (Miss. 2003)). Don asserts that Melanie was awarded, among other things, $37,000 from the sale of the marital residence to equalize the property division and therefore was not left with a deficit. He also points out that Melanie was further awarded 75 percent of the remaining proceeds from the sale of the marital home. On remand, the chancellor should consider whether either party is left with a deficit that necessitates the award of alimony.

¶41. In determining whether either party is left with a deficit, the chancellor should also consider the parties' non-marital assets. As stated in Issue I, although separate property is not subject to equitable division, it may be considered when deciding the issue of alimony. *See Brown*, 797 So. 2d at 256 (¶6); *see also Lowrey*, 25 So. 3d at 293 (¶44) ("If the situation

19

is such that an equitable division of marital property, considered with each party's non-marital assets, leaves a deficit for one party, then alimony based on the value of non-marital assets should be considered."). The chancellor found that the diamond ring was Melanie's separate property. Melanie valued the diamond ring at $14,000 and $18,000 in her financial disclosures. Whereas Don valued the ring at $25,500 in his financial disclosure. The marital balance sheet valued the ring at $20,000. At trial, Melanie testified that the ring was appraised for $14,000, but she acknowledged that it may have been insured for $25,000 years earlier. In her bench ruling, the chancellor stated, "[o]f course, [Melanie's] diamond wedding ring, she says it's worth $14,000, but it was a non-marital asset, so I guess it doesn't really matter." This was error. On remand, the chancellor should consider the parties' non-marital assets in assessing the equitable distribution and continuing support.

¶42. Additionally, as with the property division, the chancellor did not consider the debts—specifically, the $10,208.17 in medical bills—assigned to Don when deciding the issue of alimony. In *Johnson*, our supreme court noted that "[i]f the question of alimony [was] reached, the debt would again be a factor for consideration." *Johnson*, 650 So. 2d at 1286. On remand, the chancellor should consider not only the income and assets of each party but also the expenses and obligations of each party when deciding the issue of alimony. *Armstrong*, 618 So. 2d at 1280. We further note that "alimony awards in excess of a spouse's ability to pay are 'per se unreasonable.'" *Peterson v. Peterson*, 129 So. 3d 255, 258 (¶14) (Miss. Ct. App. 2013) (quoting *Sheffield v. Sheffield*, 55 So. 3d 1142, 1145 (¶9) (Miss. Ct. App. 2011)).

¶43.    Finally, Don claims that the chancellor improperly imputed additional income to him. In her bench ruling, the chancellor noted that Don's net income was approximately $6,469 per month.[16] The chancellor then found that in order to equalize Don and Melanie's incomes, she would have to award Melanie $2,330 per month in alimony. However, the chancellor found that Don had "extra income" by virtue of driving a company vehicle and using company credit cards to pay for gasoline, auto repairs, and meals. The chancellor determined that Don charged, on average, approximately $10,000 per month to company credit cards. The chancellor recognized that some of the charges were business expenses but imputed an additional $6,000 to $7,000 of monthly income to Don and increased the award of alimony to $3,500 per month. As discussed, we reverse the issue of alimony and remand for the chancellor to equitably divide the marital property and consider whether there is a deficit that necessitates an award of alimony. On remand, the chancellor should address how Don's non-work use of work assets is attributable to him as income when reconsidering the division of property and alimony.

### III.    Contempt

¶44.    Next, Don claims that the chancellor erred by finding him to be in contempt for failing to pay certain expenses under the temporary order.

¶45.    "Contempt matters are committed to the sound discretion of the trial court." *Chism v. Chism*, 285 So. 3d 656, 666 (¶35) (Miss. Ct. App. 2019) (quoting *Doyle v. Doyle*, 55 So.

---

[16] According to the appellant's brief, "[t]he monthly net income calculated in Don's Rule 8.05 disclosures includes the temporary alimony he was paying and health insurance that would not be reflective of an accurate expense following the divorce."

3d 1097, 1110 (¶44) (Miss. Ct. App. 2010)). "The primary purpose of a civil-contempt order is to enforce compliance with a court order." *Id*. (citing *Stallings v. Allen*, 201 So. 3d 500, 504 (¶14) (Miss. Ct. App. 2016)). "Failure to comply with a court order is prima facie evidence of contempt." *Id*. (quoting *Gilliland v. Gilliland*, 984 So. 2d 364, 369 (¶19) (Miss. Ct. App. 2008)). "To rebut a prima facie case of contempt, a defendant must show an 'inability to pay, that the default was not willful, that the provision violated was ambiguous, or that performance was impossible.'" *Id*. "An adjudication of civil contempt must be prove[d] by clear and convincing evidence." *Id*.

¶46. In 2019, the chancellor entered a temporary order requiring Don to pay "for any and all of the repairs on the marital home," and for "marital debts and expenses including but not limited to medical insurance." Approximately two months later, Don filed an emergency motion to clarify, amend, or modify the temporary order. Don argued, among other things, that the chancellor's provision requiring him to pay the "marital debts and expenses including but not limited to medical insurance" was confusing. Around January 2020, the chancellor entered an order nunc pro tunc clarifying its prior temporary order. The order stated that Don "shall continue to pay all the bills needed to operate the household, including but not limited to AT&T, utilities, and medical bills."

¶47. Several months later, Melanie filed a petition for citation of contempt. According to Melanie, Don failed to comply with the court's temporary order by failing to pay certain expenses. Don filed a response and asserted, among other things,[17] that he had not willfully

---

[17] Don asserted the following additional defenses: failure to state a claim upon which relief could be granted, the affirmative defenses in Rule 8 of the Mississippi Rules of Civil

violated the court's order. Then Don filed another motion for clarification.

¶48. At trial, Don's attorney stated that Don had put approximately $13,000 in an escrow account, and Don stated, "[T]he thing is, there are some of those things on there that I believe that I am responsible to pay for, but there's other ones I don't believe I am." The chancellor seemingly acknowledged that the temporary order "may not have been totally clear to [Don.]" However, the chancellor ultimately held Don in contempt for his "failure to pay certain amounts as ordered in the Temporary Order . . . ." These expenses included: eyeglasses, cancer insurance, auto repairs, home maintenance/repairs, and lawn maintenance.

¶49. Based upon the chancellor's findings and the record, we find that any default was not willful. The specific obligations that Don was required to pay and for which he was held in contempt for not paying were not "complete within the judgment." *Lindsay v. Lindsay*, 303 So. 3d 770, 780 (¶26) (Miss. Ct. App. 2020). In other words, Don was held in contempt for not paying obligations that were never specifically set forth within the four corners of the written temporary order. *Id*. It was reasonable for Don to question whether expenses associated with a pair of eyeglasses and maintaining a supplemental cancer insurance policy constituted medical bills. Additionally, nowhere in the court's amended order was Don required to pay for auto repairs. While the orders mentioned repairs for the home, the amended order did not mention the yard. Instead, it ordered Don to pay "bills needed to operate the household, including but not limited to AT&T [and] utilities[.]" The orders were vague and confusing enough to justify Don's attempts to clarify them. Therefore, the order

_____

Procedure, the clean hands doctrine, and insufficiency of process.

23

of contempt and judgment in the amount of $11,103.15 against Don is reversed and that part of the chancellor's judgment is rendered. The chancellor may assess payment of such expenses as would be proper on remand but not as contempt.

### IV.    Attorney's Fees

¶50.    Finally, Don claims that the chancellor's award of attorney's fees should be reversed. "The award of attorney's fees in divorce cases is left to the discretion of the chancellor, assuming she follows the appropriate standards." *Vandenbrook v. Vandenbrook*, 292 So. 3d 991, 1004 (¶46) (Miss. Ct. App. 2019) (quoting *Speights v. Speights*, 126 So. 3d 76, 81 (¶15) (Miss. Ct. App. 2013)). "A chancellor's award or denial of fees should be supported by findings of fact regarding the *McKee* factors." *Id*. These factors include:

> (1) relative financial ability of the parties; (2) the skill and standing of the attorney employed, (3) novelty and difficulty of issues in the case, (4) the responsibility required in managing the case, (5) time and labor required, (6) the usual and customary charge in the community, and (7) whether the attorney was precluded from undertaking other employment by accepting the case.

*Gilmer v. Gilmer*, 297 So. 3d 324, 339 (¶53) (Miss. Ct. App. 2020) (quoting *Black v. Black*, 240 So. 3d 1226, 1235 (¶27) (Miss. Ct. App. 2017)). "Generally, a chancellor should only award attorney's fees where the moving party shows an inability to pay." *Id*.

¶51.    Don argues that because the contempt judgment must be reversed, so should the award for attorney's fees in connection with the contempt action. We agree. Because we reverse and render the contempt judgment, we reverse and render the $1,500 award of attorney's fees awarded to Melanie. *Allred v. Allred*, 735 So. 2d 1064, 1068-69 (¶17) (Miss. Ct. App. 1999).

¶52.    Next, Don argues that because the property division and alimony must be reversed,

24

so should the award of attorney's fees for the divorce action. This Court has held that when "we reverse the property division and alimony, the attorney's fees *may* be revisited on remand." *Pierce v. Pierce*, 42 So. 3d 658, 664 (¶27) (Miss. Ct. App. 2010) (citing *Gray v. Gray*, 909 So. 2d 108, 113 (¶22) (Miss. Ct. App. 2005)). The chancellor awarded Melanie $19,071.75 toward her attorney's fees after Melanie testified that she was not able to afford attorney's fees. Additionally, Don seemingly testified that he assumed Melanie was charging her litigation expenses to a credit card or borrowing money from someone to pay for them. However, this Court has held that "[t]he chancellor can consider assets received as part of an equitable distribution when determining a party's ability to pay attorney's fees." *Faerber v. Faerber*, 13 So. 3d 853, 863 (¶40) (Miss. Ct. App. 2009). Accordingly, the chancellor should reconsider this issue on remand in light of the reversal of the property division and alimony awards.

¶53. Finally, Melanie seemingly requests attorney's fees on appeal. Our supreme court has held that parties must request appellate attorney's fees in a motion that complies with Mississippi Rule of Appellate Procedure 27(a). *Latham v. Latham*, 261 So. 3d 1110, 1115-16 (¶¶22-24) (Miss. 2019). On September 8, 2021, Melanie filed a "Motion and Incorporated Memorandum of Law for Leave to File Affidavit of Attorney Fees and Expenses Incurred by Wife on Appeal." In an order dated November 30, 2021, this Court denied Melanie's request without prejudice to her ability to submit such documents along with a motion for appellate attorney's fees after this Court has handed down its opinion, but before the mandate has issued. As we reverse and remand, we note that Melanie has not prevailed in this appeal;

25

however, we also note we are remanding for a more appropriate determination of attorney's fees. Nevertheless, we note that under Mississippi Rule of Appellate Procedure 36(a), "[i]f a judgment is reversed, costs shall be taxed against the appellee unless otherwise ordered."

## CONCLUSION

¶54. After review, we reverse in part the chancellor's judgment regarding the division of property and alimony and remand for further proceedings consistent with this opinion. We reverse and render the chancellor's finding of contempt and the corresponding award of attorney's fees for contempt to Melanie. On remand, the chancellor should revisit the award of attorney's fees for the divorce action in light of the reversal of the property division and alimony awards.

¶55. **REVERSED AND RENDERED IN PART; REVERSED AND REMANDED IN PART.**

**BARNES, C.J., CARLTON, P.J., WESTBROOKS, McDONALD, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR. WILSON, P.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**